UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PATRICIA RICHARDSON o/b/o T.H., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> NANCY A. BERRYHILL, Deputy ) <br> Commissioner for Operations for the Social ) <br> Security Administration, ) <br> ) <br> Defendant. ) | No. 17-cv-6350 <br><br> Magistrate Judge Susan E. Cox |

## MEMORANDUM OPINION AND ORDER

Plaintiff Patricia Richardson ("Plaintiff") on behalf of her minor ward, T.H., appeals the decision of the Commissioner of Social Security ("Commissioner") to deny T.H.'s application for disability benefits. For the following reasons, Plaintiff's motion for summary judgment is granted [dkt. 18], and the case is remanded for further proceedings consistent with this Opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

**A.  Medical/Academic History**

T.H. was born on May 22, 2004. (R. 29.) Unfortunately, much of T.H.'s early childhood was marked by instability until Plaintiff became her guardian.[1] (R. 415-416, 515). Perhaps due to the volatility of T.H.'s first few years, she has struggled to keep stride with some of her classmates academically, and the record reflects that she has had trouble developing appropriate coping mechanisms. In 2013, T.H. was referred for evaluation for an Individual Education Program ("IEP") due to "poor academic performance." (R. 414.) The IEP states that T.H. was hospitalized at Hartgrove Hospital in 2010 for two weeks for depression, and diagnosed with Impulse Control

---

[1] Following her placement in Plaintiff's home, T.H.'s life appears to have become much more stable. It was noted in T.H.'s initial assessment by a Chicago Public School Nurse that Plaintiff was "an outstanding individual working on behalf of [T.H.]," which is certainly borne out elsewhere the record through Plaintiff's tireless attempts to get T.H. the help she needs to keep up in school and receive adequate medical treatment. (R. 416.)

Disorder. (R. 414, 419.) As part of the IEP, T.H. was given a battery of tests. On the Weschler Individual Achievement Test ("WIAT-III"), the majority of T.H.'s scores were far below average (*e.g.*, bottom 10th percentile in eight of 16 categories, with only five categories above the 27th percentile); her overall score on the WIAT-III was in the "below average" range. (R. 419-422.) The IEP also assigned T.H. a score on the Reynolds Intellectual Assessment Scales ("RIAS"), which showed that she was below average in the verbal index (19th percentile) and memory index (21st percentile), and average in the non-verbal index (63rd percentile) and composite index (32nd percentile). (R. 420.) T.H.'s teacher completed the Behavior Assessment System for Children ("BASC-2"), and found that T.H. was "at-risk" in the areas of hyperactivity, atypicality, and attention problems, and had "clinically significant" issues in aggression, conduct problems, anxiety, depression, and withdrawal. (R. 423.) Finally, T.H. was evaluated pursuant to the Vineland II Adaptive Rating Scales ("VABS-II"), which revealed that T.H. performed low in the domain of communication (2nd percentile), moderately low in socialization (16th percentile) and adaptive behavior composite (7th percentile) domains, and adequate in daily living skills (18th percentile). (*Id*.) It was recommended, *inter alia*, that T.H. "receive special education services under the category of a Learning Disability." (R. 424.)

Prior to fourth grade, T.H. was re-evaluated for her IEP. The evaluation starts out by noting that T.H.'s strengths included being eager to please her peers and adults, and that she had improved significantly in her behavior. (R. 437.) However, it further stated that she struggled "drastically with organizational skills," was easily distracted, and needed "constant encouragement and praise to help her achieve academic and behavioral success." (*Id*.) The evaluation also mentioned that when T.H. "is frustrated or angry, she has difficulty expressing herself and may shut down or not respond." (R. 438.) This evaluation relied on the previous scores for T.H. on the WIAT-III and BASC-2 tests. (R. 437.) The IEP provided that T.H. be given 50% extended time for classwork, homework, and

assessments (R. 442), and that she receive 360 minutes per week of special education in the general classroom and 150 minutes per week in a separate break-out classroom. (R. 454.)

T.H.'s fifth grade IEP was completed in September 2014. (R. 301.) The evaluator wrote that T.H. "struggles with meeting her grade level academic goals and it effects (sic) her efficiency and effectiveness in the classroom on a social and emotional level." (R. 303.) However, the IEP indicated that T.H. had showed some improvement over the previous year, as her special education minutes were reduced to 285 weekly in-class minutes, and 30 weekly minutes in a separate classroom. (R. 311.)

The final IEP presented to the Administrative Law Judge ("ALJ") was for T.H.'s sixth grade year. It maintained the same amount of time for special education services as the previous IEP (*i.e.*, 285 minutes weekly in the general classroom, and 30 minutes weekly in a separate classroom). (R. 329.) The IEP also reported T.H.'s scores in the Northwest Evaluation Association ("NWEA") test, which demonstrated that she was in the low range for literature, informational text, vocabulary acquisition and use, operational and algebraic thinking, measurement and data, number operations, and geometry; T.H. was two standard deviations below the mean in her reading score. (R. 318, 341.) The narrative information on T.H.'s sixth grade IEP was more of a mixed bag. It noted that she would often attempt to avoid classes by going into classes that were not on her schedule, and noted that "this would be considered a part of her ADHD because of her limited level to concentrate in terms of long term and short term concentration." (R. 318.) It further stated that her "learning disability greatly impedes her ability to access the general education curriculum and she requires specialized instruction to be successful," and "sometimes has difficulty expressing herself when upset or frustrated and may shut down or not respond." (R. 325.) However, there was progress evident in the IEP, including "basic improvement with her reading skills" and being "able to step outside herself and take a risk for wanting knowledge," instead of "completely shut[ting] down or

isolate[ing] herself from the teach or whoever is there to instruct her." (R. 323.)

The administrative record also included several Social Security Administration Questionnaires filled out by T.H.'s teachers and school counselors. The first was completed in October 2013 by T.H.'s teacher, who reported that T.H. "often displays age inappropriate behaviors," such as crying, frowning, pouting, and refusing to speak when she did not get her way. (R. 433.) The teacher found that T.H. had an obvious problem in handling frustration appropriately, and slight or no problems in the remainder of the categories. (*Id.*)

The same teacher filled out a second questionnaire on June 2, 2014, stating that T.H.'s reading grade level was at 1.4, math grade level was at 2.2, and written language grade level was 5.2 (T.H. was in fourth grade at the time). (R. 248.) She noted that T.H. appeared "immature emotionally," but had improved over the course of the year. (R. 253.) She found that T.H. had obvious problems in the following areas: expressing ideas in written form, learning new material, recalling and applying previously learned material, sustaining attention during play, focusing long enough to finish an assigned activity or task, refocusing to a task when necessary, waiting to take turns, working without distracting others, following rules, introducing and maintaining relevant and appropriate topics of conversation, handling frustration appropriately, and responding appropriately to changes in her own mood. (R. 249-253.) T.H. also exhibited serious problems with organizing her own things or school materials, completing class/homework assignments, and completing work accurately without careless mistakes. (R. 250.) The remainder of the categories were graded as showing slight or no problems. (R. 249-253.)

The final questionnaire, signed and dated February 2, 2015, was apparently completed by multiple teachers or counselors, judging by the variety of handwriting on the questionnaire. It shows that T.H.'s problems were becoming more pronounced. She had serious problems in the following areas: comprehending oral instructions, understanding school and content vocabulary, reading and

comprehending written material and doing math problems, providing organized oral explanations and adequate descriptions, expressing ideas in written form, applying problem-solving skills in class discussion, and using good judgment regarding personal safety and dangerous circumstances. (R. 275-279.) She also exhibited very serious problems in identifying and appropriately asserting emotional needs, responding appropriately to changes in her own mood, using appropriate coping skills to meet daily demands of the school environment, and knowing when to ask for help. (R. 279.) There was also a slew of obvious problems identified. (R. 275-79.) One teacher noted that T.H.'s problems in her interpersonal life and dealing with her academic problems were impeding her academic growth. (R. 275.) Another stated that T.H. struggled to complete her homework, despite accommodations and modifications. (R. 276.) A third opined that T.H. struggled academically and emotionally, and did not know how to re-direct herself when she became frustrated. (R. 279.)

The record also shows that T.H. spent several weeks treating at the pediatric day program at Garfield Park Hospital, after her "[s]chool requested partial hospitalization due to inability to focus, hyper in the classroom, day dreaming, poor attention, and focus." (R. 519.) Upon admission, T.H. demonstrated grossly intact concentration, attention, and memory, but she was described as "distracted and fidgety" the day after her admission. (R. 520.) T.H. reported that it was difficult for her to understand reading and math, even when she got help. (R. 522.)

T.H.'s administrative file also includes opinion evidence from several State agency consultants. In November 2013, Donna Hudspeth, Psy. D., and Victoria Dow, M.D., both found that T.H. did not meet, medically equal, or functional equal any listing, and had less than marked impairments in all functional domains. (R. 79-80.) In July 2014, Howard Tin, Psy. D., and Deborah Allbright, M.D., reviewed T.H.'s claim and made the same findings as the aforementioned consulting doctors, except they found that T.H. had marked limitations in the domain of Acquiring and Using Information. (R. 88-90.) Finally, in April 2015, Glen Pittman, M.D., and Bharati Jhaveri,

5

M.D., reached conclusions that matched the November 2013 findings of the first Stage agency doctors. (R. 98-100.) Although the ALJ indicated that Drs. Pittman and Jhaveri reviewed "updated records,"[2] there is no indication that they received the latest IEP and their opinions pre-date Plaintiff's hospitalization. (R. 33.)

**B.     Procedural History/ALJ Opinion**

On March 21, 2014, an application was filed on behalf of T.H. with an alleged disability onset date of August 1, 2008. (R. 26.) The claim was initially denied on November 7, 2013, and upon reconsideration on April 17, 2015. (*Id.*) Plaintiff filed a written request for a hearing, which took place on August 15, 2016, before ALJ Laurie Wardell. (*Id.*) On September 26, 2016, the ALJ issued an opinion finding that T.H. was not disabled. (R. 26-43.) The ALJ found that T.H. suffered from severe impairments in the form of a learning disorder, Attention Deficit Hyperactivity Disorder ("ADHD"), and a cleft lip status post-surgery,[3] but that T.H.'s impairments did not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 29.) In the six functional equivalence domains (discussed more fully below), the ALJ found that T.H. had less than marked limitations in the domains of Acquiring and Using Information, Attending and Complete Tasks, Interacting and Relating with Others, Caring for Yourself, and Health and Physical Well-Being, and no limitations in Moving About and Manipulating Objects. (R. 35-42.) Because the Court finds that the ALJ failed to build an accurate and logical bridge between her findings on the functional domains and the evidence in the record, the Court remands this case for proceedings consistent with this opinion.[4]

---

[2] The updated records appear to primarily be a Psychological Assessment performed by Mark B. Langgut, Ph.D., on March 11, 2015. (R. 514.) T.H. showed no behavioral abnormalities, but deficient basic computational skills. (R. 516.) Dr. Langgut found that T.H. had a learning disorder and a history of child abuse, but deferred all other diagnoses. (R. 517.)

[3] The record includes treatment for T.H.'s cleft lip, but the Plaintiff's brief does not address any of the ALJ findings on that front, so the Court will not discuss them further in this Opinion.

[4] Because the Court remands on the basis articulated above, it does not reach the other issues raised by the Plaintiff on this appeal.

## SOCIAL SECURITY REGULATIONS AND STANDARD OF REVIEW

A child under the age of eighteen is considered disabled if she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). If the child is not working and has a severe impairment, the ALJ must determine whether the child's impairments meet, medically equal, or functionally equal the listings found in 20 C.F.R. Ch. 404, Subpart P, Appendix 1. 20 C.F.R. § 416.924(a)-(d). In determining whether a child's impairments functionally equal a listing, the ALJ considers six domains: 1) acquiring and using information; 2) attending and completing tasks; 3) interacting and relating with others; 4) moving about and manipulating objects; 5) caring for oneself; and 6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(iv).

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining if the final decision of the Commissioner of Social Security is based upon substantial evidence and the proper legal criteria. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). In reviewing a commissioner's decision, the Court may not "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Even where "reasonable minds could differ" or an alternative position is also supported by substantial evidence, the ALJ's judgment must be affirmed if supported by substantial evidence. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008); *Scheck*, 357 F.3d at 699.

However, the ALJ must also build an accurate and logical bridge between the evidence and

the result to allow meaningful judicial review of the ALJ's findings and conclusions. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir.2010). The court must be able to trace the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015). "Even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that logical bridge." *Aranda v. Berryhill*, 2018 WL 2426906, at *2 (N.D. Ill. May 30, 2018) (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)). While the ALJ need not discuss every piece of evidence in the record, the ALJ must also take care to avoid "cherrypicking" those portion of the record that support her conclusions, while ignoring those that do not. *See Bauer v. Astrue*, 730 F. Supp. 2d 884, 893 (N.D. Ill. Aug. 11, 2010).

## **DISCUSSION**

The Court does not believe that the ALJ built an accurate and logical bridge between the evidence she cited in the record and the conclusions she ultimately reached in the functional domains listed above. While the ALJ did an admirable job detailing and cataloging T.H.'s medical history, the opinion evidence, and her various IEPs, when it came to explaining precisely how or why that evidence supports or refutes her conclusions, the ALJ fell short. The Court will discuss some examples below.

**A.   Acquiring and Using Information**

In the domain of Acquiring and Using Information, the ALJ noted T.H.'s RIAS and WIAT-III scores and discussed the IEP findings and recommendations, but failed to explain why this evidence supported her conclusions. For example, the Court is left to guess why 285 minutes of special education and no "pull-out" services (which were both cited as supporting evidence by the ALJ) would be indicative of a less-than-marked limitation in this domain. (R. 36.) It seems equally plausible to the Court that almost one hour of special education instruction per day could be equally

8

indicative of a marked limitation in Acquiring and Using Information, and the ALJ's discussion sheds no light on how this evidence proves the ALJ's finding in this domain.

Moreover, the ALJ failed to build an accurate and logical bridge in this domain by engaging in improper cherrypicking. In particular, the ALJ pulled one quote from T.H's IEP stating that Plaintiff "does very well in the classroom" when she puts forth her best effort, and used it support the ALJ's finding that T.H. does not have marked limitations in Acquiring and Using Information. This very same IEP noted that T.H. "struggles with meeting her grade level academic goals," which is arguably more persuasive evidence regarding T.H.s ability to acquire and use information. (R. 303.) However, that passage is not cited anywhere in the discussion of this domain. Moreover, the ALJ did not mention any of the myriad other evidence in the record suggesting Plaintiff's limitations in this domain that appear elsewhere in the record, including the most recent Social Security Administration Teach Questionnaire, which showed that T.H. exhibited serious problems in several areas that would directly impact this domain, including comprehending oral instructions, understanding school and content vocabulary, reading and comprehending written material, comprehending and doing math problems, expressing ideas in written form, and applying problem-solving skills in class discussions.[5] (R. 275.)

Finally, the Court notes that at least one State agency reviewer found that T.H. had marked limitations in this domain, but the ALJ did not rely on this because there were also two state agency reviewers who found otherwise. This might be sufficient if the ALJ's reasoning for assigning less weight to the consultant who found marked limitations in Acquiring and Using Information were

---

[5] The ALJ only gave slight weight to this questionnaire because "it is not clear who completed each portion, in what capacity each person interacted with the claimant, or how frequently or how long each person had interacted with the claimant." (R. 35.) The Court does not believe the ALJ adequately explained why this necessarily makes the questionnaire unreliable. First, there are at least two identifiable individuals who filled out the form – Dwight Powell (the school social worker) and Nancy Handwerker (T.H.'s case worker). Second, there a fair assumption that each portion of the questionnaire was filled out by the individual likely to have the most knowledge regarding that respective section. Finally, even if each of these individuals spent very little time with T.H., it is unclear how the ALJ could consider that a detriment while maintaining logical consistency when she gave the most weight to the opinions State agency reviewers who had never met T.H. at all.

9

more robust. However, the ALJ simply stated that she found "that the totality of the evidence more firmly supports the conclusion of Drs. Pittman and Hudspeth, who each independently concluded the limitation in that domain was less than marked." (R. 33.) It is unclear which portions of the record comprise the "totality" of the evidence, and the ALJ makes no effort to cite those portions that support this conclusion. Again, one could easily find evidence in the record to conclude that Dr. Tin's opinion that T.H. had marked limitations in this domain was correct, and it was the ALJ's duty to build a logical bridge between the evidence that supported a contrary conclusion and her findings. She did not do so, and the Court must remand on this basis.

### B.   Attending and Completing Tasks

The Court finds that the ALJ's opinion suffers from the same issue in the domain of Attending and Completing Tasks. Again, the ALJ relied on the State agency physicians' findings to support her conclusion in this domain. However, those findings were made before T.H. was hospitalized for four weeks for ADHD at the request of her school. It is difficult to imagine how the ALJ could have relied on those doctors' findings when they did not have the benefit of those hospital records. Furthermore, ALJ did not attempt to explain why those findings would be authoritative on this issue, which would have been so obviously affected by those records. In order for the ALJ to build a logical bridge, she will need to explain why those findings remain compelling in light of the subsequent medical history.

Additionally, the ALJ's treatment of the hospital records themselves is equally problematic. The ALJ does note that Plaintiff was in a partial hospitalization program for ADHD, but discounts the probative value of those records because T.H. "exhibited grossly intact attention and concentration." (R. 37.) While that may have been true, the remainder of T.H.'s records from Garfield Park Hospital paint a very different picture. Besides appearing fidgety at the initial intake, the record shows that T.H. was prescribed Ritalin, but failed to get her prescription filled (R. 529)

and then forgot to take her medications over the weekend at one point. (R. 539.) Moreover, the ALJ did not mention that the hospitalization was the behest of T.H.'s school, where she was observed on a daily basis and it was determined that she would require a partial hospitalization program "due to inability [to] focus, hyper in the classroom, day dreaming, poor attention and focus." (R. 519.) It would be impossible for the ALJ to accurately assess a domain that "considers how well a child is able to focus and maintain attention, and how well she is able to being, carry through, and finish activities" without a significantly more in-depth discussion of these records and their effect on T.H.'s limitations in this domain. (R. 36.) Because the ALJ failed to do so, the Court believes that she failed to build a logical bridge between the evidence and her conclusions.[6]

## CONCLUSION

For the foregoing reasons, Plaintiff's motion is granted [dkt. 18], and the case is remanded for further proceedings consistent with this opinion.


ENTERED: 7/27/18

_____
U.S. Magistrate Judge, Susan E. Cox

---

[6] Because the ALJ erred in analyzing at least two functional domains, it leaves open the possibility that T.H.'s condition functionally equals a listing. That is sufficient to require remand. However, the Court wants to be clear that the ALJ should not focus only the two functional domains discussed in this Opinion, but the ALJ should analyze all of the domains on remand. Additionally, although the Court did not reach the issues raised by the Plaintiff in this matter relating to the Appeals Council's rejection of additional records presented by the Plaintiff, the Court believes it would be prudent for the ALJ to admit those records into evidence on remand, and include them in any subsequent opinion issued by the ALJ.